[No. 22982-3-III.   Division Three.   May 17, 2005.]

EARL HIGGINS ET AL., *Appellants*, v. SCOTTSDALE INSURANCE COMPANY, *Respondent*.

488

*John Montgomery* (of *Waldo Schweda & Montgomery, P.S.*), for appellants.

*Randall R. Adams*, for respondent.

¶1 Schultheis, J. — Carolyn and Earl Higgins held a secured interest in property pursuant to a deed of trust executed by Larry and Pamela Kelty. The Keltys obtained homeowner's insurance from Scottsdale Insurance Company to insure the property. When the Keltys failed to pay the premiums on the insurance to the premium finance company—Tepco Premium Finance, L.L.C.—Tepco canceled the policy in March 2002.[1] No one sent notice of the cancellation to the Higginses until mid-August 2002. In late August 2002, the property was damaged by fire. After the Keltys quitclaimed the property to the Higginses, the Higginses sued Scottsdale, contending coverage was still in force at the time of the fire because they were not properly notified of the policy's cancellation.

¶2 The trial court denied the Higginses' motion for summary judgment and granted Scottsdale's cross-motion for summary judgment dismissal of the complaint. On

---

[1] Neither the Keltys nor Tepco is a party to these proceedings.

appeal, the Higginses contend cancellation of their coverage was improper under the policy, under Washington insurance statutes and regulations, and under principles of public policy. Because we find no duty under the contract, statute, regulations, or public policy for the insurer to notify the mortgagee of a cancellation by the insured, we affirm.

FACTS

¶3 The following facts are not disputed. In February 2000, the Higginses sold the Keltys property in Spokane County pursuant to a deed of trust naming the Higginses as the beneficiaries or mortgagees. According to the terms of the deed of trust, the Keltys were required to procure homeowner's insurance. They purchased coverage from surplus lines carrier Scottsdale, an Arizona corporation.[2] The Keltys arranged payment of their insurance premiums through Tepco and its general agent, Cochrane and Company. Tepco paid the premiums to Scottsdale and received periodic payments from the Keltys to cover those premiums. The premium finance agreement with Tepco contained the following language: "Upon default in payment of any installment, LENDER will cancel the policy in accordance with authority given LENDER by the insured to cancel on his behalf." Clerk's Papers (CP) at 132. The agreement also provided that the Keltys irrevocably appointed Tepco as their attorney in fact with full authority to cancel.

¶4 The Keltys fell behind in their premium payments to Tepco. In December 2001, they received a notice from Tepco effective December 10 stating that their policy was canceled by Tepco for nonpayment "pursuant to the authority given us by the power of attorney in your 'premium finance agreement.'" CP at 134. Evidently the Keltys made arrangements to pay the delinquent payments and Tepco sent them notice in February 2002 that it was asking Scottsdale

---

[2] A "surplus lines carrier" is an insurance company that is not authorized in Washington but that is allowed to cover higher risk properties when regular policies are not available. RCW 48.15.040; *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 332 n.1, 779 P.2d 249 (1989).

to reinstate the policy. However, Tepco eventually sent a final notice to the Keltys that it was canceling the policy for nonpayment effective March 12, 2002.

¶5 Five months later, on August 21, 2002, Cochrane and Company sent the Higginses notice that the Keltys' homeowner's policy had been canceled in March. On August 31, 2002, a fire started in the Keltys' kitchen and damaged the property. After the fire, the Keltys voluntarily conveyed the property to the Higginses by quitclaim deed in lieu of foreclosure. The Higginses filed a claim for insurance proceeds from Scottsdale on the basis of their status as the mortgagees with an interest in the property. This claim was denied.

¶6 In August 2003, the Higginses filed a complaint against Scottsdale for declaratory judgment and money damages. They requested a judgment declaring that the homeowner's policy was in effect at the time of the fire and sought sums due under the policy. Scottsdale's answer included a counterclaim for declaratory judgment that it was under no duty to pay the claim. Both parties moved for summary judgment. After oral argument and consideration of the documents, the trial court issued a letter opinion on March 5, 2004, finding no duty under contract, statute, regulations, or public policy for the insurer to notify a mortgagee of a cancellation of an insurance policy by the insured or an entity representing the insured. Summary judgment was granted to Scottsdale, dismissing the Higginses' complaint with prejudice. This appeal timely followed.

CANCELLATION OF THE HOMEOWNER'S POLICY WITHOUT NOTICE

¶7 The question on appeal is whether a homeowner's policy canceled by the premium finance company acting for the insured is also canceled as regards the mortgagee if the insurer never notified the mortgagee of the cancellation. The Higginses contend Scottsdale was compelled by the contract of insurance, by statute and related

regulations, and by public policy to give them notice of the policy's cancellation. Without such notice, they contend, the policy remained in effect regarding their interest as mortgagees when the loss occurred. Because this is an appeal of a summary judgment, our review is de novo. *Butzberger v. Foster*, 151 Wn.2d 396, 401, 89 P.3d 689 (2004). Our review of the interpretation given to the language of an insurance policy is also de novo. *Id.*

¶8 *I. Notice under the insurance policy.* We begin by examining the homeowner's policy and the premium finance agreement. The definitions section of the policy states that all references to "you" and "your" mean the "named insured," while all references to "we," "us," and "our" mean the insurer. CP at 28. The named insureds are the Keltys and the insurer is Scottsdale. On the page entitled "Schedule of Mortgagees, Additional Insureds and Lienholders," the Higginses are listed as mortgagees. CP at 25. Subsection 5 under the conditions section of the policy concerns cancellations. The Keltys are informed that they may cancel the policy at any time by returning it or by letting Scottsdale know in writing. Scottsdale, however, may cancel the policy only for specified reasons and with advance written notice to the Keltys. Under the provision on cancellation by Scottsdale, the policy states, "[w]e will also let any mortgagee or other person shown by the policy to have an interest in a covered loss know at least 20 days before the date cancellation takes effect." CP at 45. Subsection 5 concludes with the following statement: "Except as noted above, if the policy is cancelled by us, we will give the same advance notice of cancellation in writing to any mortgagee or other person shown by the policy to have an interest in a covered loss as we give to you." CP at 46.

¶9 An insurance policy's language is given the same reasonable and sensible construction as would be given by the average person buying insurance. *Butzberger*, 151 Wn.2d at 401. Terms that are defined in the policy are interpreted according to that definition. *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 576, 964 P.2d 1173 (1998).

We may not modify an insurance contract if the policy language is clear and unambiguous. *Id.* Using the definitions supplied by the policy and applying a reasonable construction of subsection 5, we conclude that the policy unambiguously treats cancellation by the insured differently than cancellation by the insurer. Scottsdale agrees to notify the mortgagee only if it cancels the policy; it does not state that it will notify the mortgagee if the Keltys cancel.

¶10 Thus, we next determine who canceled the Keltys' homeowner's policy. The premium finance agreement between Tepco and the Keltys states that Tepco may cancel the insurance policy if the Keltys fail to pay their periodic installments:

> POWER OF ATTORNEY: That in the event of a default in payment of any installment due hereunder, or upon failure to comply with any of the terms or conditions hereof, the unpaid balance due hereunder shall be immediately due and payable[;] in such an event Tepco may cancel the insurance policies listed in the schedule. The Insured hereby irrevocably appoints Tepco attorney in fact with full authority to cancel the said policies.

CP at 188. Tepco's notice to Scottsdale of the premium finance agreement states that "[u]pon default in payment of any installment, LENDER [Tepco] will cancel the policy in accordance with authority given LENDER by the insured to cancel on his behalf." CP at 132. In Tepco's notices of cancellation sent to the Keltys and to Scottsdale, Tepco informed the Keltys that "the insurance policy(ies) listed below is hereby cancelled by the lender for non-payment, pursuant to the authority given us by the power of attorney in your 'premium finance agreement.'" CP at 134. Tepco then stated, "the lender hereby instructs the insurance company to cancel the insurance policy(ies)." CP at 134.

¶11 The Higginses contend that although Tepco instructed Scottsdale to cancel the policy, it was actually Scottsdale that canceled under the terms of the policy and the premium finance agreement. As far as Scottsdale was concerned, however, the premiums for the homeowner's policy had been paid (by Tepco) and the policy would remain

in force until the end of its term. Tepco, under its power of attorney, was authorized by the premium finance agreement and the insurance agreement to cancel the policy before the end of its term. While it is true that cancellation of the policy required an administrative act by Scottsdale to officially close the insurance account, the real cancellation was effected by Tepco. Accordingly, the homeowner's policy was canceled by the Keltys, through the power of attorney granted to Tepco. Because the policy does not require Scottsdale to notify the mortgagee unless Scottsdale cancels the policy, the Higginses were not entitled under the contract to notice from Scottsdale when Tepco canceled.

¶12 *II. Statutory and regulatory notice.* The Higginses next contend Washington statutory law and regulations required Scottsdale to send them notice of the policy's cancellation. In our interpretation of statutes, our objective is to give effect to the intent of the legislature. *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004). If the plain language of the statute is unambiguous, it is not subject to judicial construction. *Id.*; *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). Definitions included in the statute are controlling. *Steen*, 151 Wn.2d at 518. Any terms that are not defined will be given their ordinary meaning from a standard dictionary. *Id.*

¶13 The Higginses first cite RCW 48.18.290, entitled "Cancellation by insurer." As indicated by the title, this statute applies solely to insurance policies canceled by the insurer. When an insurer cancels a policy, the insurer is required by the statute to send written notice to the insured, accompanied by the reason for the cancellation. RCW 48.18.290(1)(a). "Like notice must also be so delivered or mailed to each mortgagee, pledgee, or other person shown by the policy to have an interest in any loss which may occur thereunder." RCW 48.18.290(1)(b). These provisions clearly and unambiguously apply only to cancellation of a policy by the insurer.

¶14 In contrast, the statutory provision applicable to cancellation by the insured, RCW 48.18.300, does not

require notice to a mortgagee. RCW 48.18.300(1) provides that the insured may cancel the policy by written notice to the insurer or by surrender of the policy for cancellation. If any person named in the policy as an interested party surrenders the policy to the insurer, a presumption arises that all interested parties concurred in the surrender. RCW 48.18.300(3). Neither RCW 48.18.290 nor RCW 48.18.300 requires an insurer to send notice to a mortgagee or any other entity with an interest in the policy if the insured cancels the policy.

¶15 Further, the notice requirements in RCW 48.18.290 do not apply to surplus line policies procured under chapter 48.15 RCW. RCW 48.18.290(5). When authorized insurance is not available for higher risk properties, a Washington resident may purchase surplus line insurance through a licensed surplus line broker. RCW 48.15.040. The policy the Keltys procured from Scottsdale was surplus line coverage. Consequently, even if the policy had been canceled by Scottsdale, RCW 48.18.290 would not have required Scottsdale to send notice of the cancellation to the Higginses. RCW 48.18.290(5).

¶16 The fact that the insured in this case canceled the policy also defeats the Higginses' argument under RCW 48.56.110. This statute applies to cancellation of a policy by a premium finance company. When, as here, the premium finance agreement contains a power of attorney that allows the premium finance company to cancel the insurance contract, the premium finance company must send notice to the insured of the cancellation. RCW 48.56.110. Additionally, "[a]ll statutory, regulatory, and contractual restrictions providing that the insurance contract may not be canceled unless notice is given to a governmental agency, mortgagee, or other third party shall apply." RCW 48.56.110(4). "The insurer shall give the prescribed notice in behalf of itself or the insured to any governmental agency, mortgagee, or other third party" within two days. RCW 48.56.110(4). This subsection does not create an independent duty to give notice. It merely states that, when the premium finance

company is acting under a power of attorney for the insured, the insurer is required to comply with all relevant notice requirements. No contractual provision or statute requires Scottsdale to provide notice to the mortgagee when the insured cancels the policy. Consequently, there is no relevant notice requirement with which Scottsdale must comply under RCW 48.56.110.

¶17 Finally, the Higginses argue that Scottsdale was required by the terms of its policy to attach a mortgagee endorsement such as the one found in WAC 284-21--010. Under the conditions section of the policy is a subsection entitled "Mortgage Clause," which states that "Insurance Commissioner's Regulation No. 335/WAC-284--21-010 requires that Form 372 (Ed 11-50) or Form 438 BFU (Ed 5-42) be endorsed on this policy, if applicable." CP at 38. According to WAC 284-21-010, the only mortgagee endorsement forms authorized for new property insurance policies are the older forms 372 and 438 and the more recently adopted form REG-335 (which amends language contained in the older forms), found in WAC 284-21-990. Form REG-335, entitled "Loss Payable Endorsement," provides that the insurer reserves the right to cancel the policy as provided by its terms, "but in such case the company shall mail to the secured party a notice stating when such cancellation shall become effective as to the interest of said secured party." WAC 284-21-990(4). The form also states that insurance related to the interest of the secured party "shall not be invalidated by any act or neglect of the insured named in said policy or his agents." WAC 284-21-990(2).

¶18 WAC 284-21-010 is not helpful to the Higginses. First, the regulation does not appear to apply to surplus line carriers. A specific regulation for surplus line insurance, WAC 284-15-010, does not discuss the use of mortgagee clauses. Second, the insurance contract between the Keltys and Scottsdale does not have an attached mortgagee endorsement and nothing in the record indicates that the parties intended to include such a modification of the policy. The mortgage clause of the policy does not require a

mortgagee endorsement, it merely requires use of a standard, approved form if an endorsement is applicable. If the parties had agreed to a mortgagee endorsement, the Higginses could have argued under the endorsement that their interest under the policy could not be invalidated by Tepco's action in canceling the policy. But without such an endorsement, their interest was not protected. Third, even under the endorsement, Scottsdale would not have been required to give notice to the Higginses unless Scottsdale canceled the policy. WAC 284-21-990(4).

¶19 *III. Public policy.* We last consider the Higginses' contention that mortgagees have an individual right to adequate notice of cancellation from an insurer. They argue that public policy supports this right.

¶20 Generally we will not invoke public policy to override express terms of insurance policies. *N.H. Indem. Co. v. Budget Rent-A-Car Sys., Inc.*, 148 Wn.2d 929, 935, 64 P.3d 1239 (2003). An agreement is contrary to public policy if it has a tendency to be against the public good. *Tjart v. Smith Barney, Inc.*, 107 Wn. App. 885, 899, 28 P.3d 823 (2001). In particular, a provision in an insurance contract may violate public policy if it is prohibited by statute or judicial decision or if it is contrary to public morals. *Budget*, 148 Wn.2d at 935.

¶21 As discussed above, the Scottsdale insurance contract's failure to require notice to the mortgagee in the event the insured cancels the policy does not violate a statute or judicial precedent. Unless the mortgagee is an additional insured under the terms of the contract, cancellation by the insured or the insured's premium finance company effectively cancels all interests. *Olivine Corp. v. United Capitol Ins. Co.*, 147 Wn.2d 148, 165-66, 52 P.3d 494 (2002). If one insured cancels, the insurer may not cancel the interests of the other insureds without notice to each of them. *Id.* at 166. Here, however, the Keltys were the only insureds in the policy. RCW 48.18.050 ("When the name of a person intended to be insured is specified in the policy, such insurance can be applied only to his own proper

interest."). As mortgagees, the Higginses may have been entitled to notice from the Keltys, but they were not entitled to notice from Scottsdale.

¶22 The Higginses contend this result sends a message to mortgagees that they are not protected if a homeowner's policy is canceled through no fault of the mortgagee. Protection is available, however, through a properly executed endorsement to the policy. The question is who has the duty to provide this protection: the insurer or the insured? Only the Keltys entered into the deed of trust agreement with the Higginses. In this agreement, they promised to obtain homeowner's insurance. The Keltys ultimately breached this agreement by effectively canceling the policy due to their failure to pay the premium to the premium finance company. Scottsdale had no duty to the Higginses. Consequently, its failure to notify the Higginses that the policy had been cancelled by the Keltys (through Tepco) did not violate public policy.

ATTORNEY FEES

¶23 In a separate section of their brief, the Higginses request attorney fees pursuant to *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 52, 811 P.2d 673 (1991), which holds that an insured is entitled to recoup attorney fees expended in a justified action to obtain the benefit of an insurance contract. *See also Butzberger v. Foster*, 151 Wn.2d 396, 413-14, 89 P.3d 689 (2004). Because we affirm the summary dismissal of the Higginses' complaint, they are not entitled to attorney fees on appeal. *Mut. of Enumclaw Ins. Co. v. Huddleston*, 119 Wn. App. 122, 125-26, 77 P.3d 360 (2003).

¶24 Affirmed.

KATO, C.J., and KURTZ, J., concur.

Review denied at 156 Wn.2d 1008 (2006).